UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

-v.-

MIGUEL QUINONES,

                                   Defendant.

---

18 Cr. 472-1 (KPF)

**ORDER**

KATHERINE POLK FAILLA, District Judge:

On April 25, 2022, defense counsel asked the Court to unseal Defendant

Miguel Quinones's sentencing transcript with certain portions redacted.  (*See*

Dkt. #119).  On April 27, 2022, the Court directed defense counsel to submit to

the Court, via email, a copy of Defendant Miguel Quinones's sealed sentencing

transcript with the proposed redactions applied.  (*Id.*).  The redacted transcript

is appended to this Order.  The Clerk of Court is directed to file this Order and

the redacted transcript on the public docket.

SO ORDERED.

Dated:  May 3, 2022
        New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge

XLCG1QUI                    SEALED

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          18 Cr. 472 (KPF)

5   MIGUEL QUINONES,

6                 Defendant.               Sentencing
    ------------------------------x
7
                                           New York, N.Y.
8                                          December 16, 2021
                                           3:40 p.m.
9

10  Before:

11                  HON. KATHERINE POLK FAILLA,

12                                         District Judge

13
                          APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  NICHOLAS FOLLY, ESQ.
         Assistant United States Attorney
17
    LAW OFFICE OF ALAIN V. MASSENA
18       Attorneys for Defendant
    BY:  ALAIN V. MASSENA, ESQ.
19

20

21

22

23

24

25

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Counsel, please state your name for
 3    the record, beginning with the government.
 4              MR. FOLLY:  Good afternoon, your Honor.  Nicholas
 5    Folly for the government.
 6              THE COURT:  Good afternoon, sir.  Thank you.
 7              MR. MASSENA:  Good afternoon, your Honor.  Alain
 8    Massena for Mr. Quinones.
 9              THE COURT:  Sir, good afternoon to you as well.
10              And Mr. Quinones, good afternoon to you.
11              THE DEFENDANT:  Good afternoon, your Honor.
12              THE COURT:  What I will tell the parties is, if you
13    find it easier to speak while seated so that we can hear you
14    with the mask on, that's fine.  Whatever is working best for
15    you.
16              Let me, though, make sure I have the materials I
17    should have for this proceeding.  I have a presentence
18    investigation report, and it is dated September 30th of 2019; I
19    have a defense sentencing submission dated December 3rd of
20    2021, and it incorporates by reference a prior sentencing
21    submission as exhibits to that submission; I have the
22    government's sentencing submission dated December 9th of 2021.
23    I know that there is an earlier preliminary order of
24    forfeiture.  I believe that was executed as well.
25              Mr. Folly, was the presentence investigation report
```

1   ever updated, to the best of your knowledge, sir?

2           MR. FOLLY:  Your Honor, I believe that I have the same

3   version that you are referring to with the same date.

4           THE COURT:  Okay.  And Mr. Massena, do you have a

5   later version?

6           MR. MASSENA:  I do not, your Honor.

7           THE COURT:  Okay.  Then I would be asking the question

8   of what I should know that has happened since this.  And I'm

9   aware, for example, and from Mr. Massena's sentencing

10  submission, of the issues with the MDC, the fire, the

11  lockdowns, the pandemic.  Those are things I don't think I need

12  additional updating on.  But to the extent there are medical or

13  mental health issues that need updating or anything else, I

14  wanted to be sure I have the most up-to-date version.

15          So Mr. Folly, if you too are working from that

16  presentence investigation report, then that is the one I will

17  be working from as well.  Thank you.

18          MR. FOLLY:  Your Honor, I just wanted to confirm the

19  date that you read.  Was that date report revised September 30,

20  2019?

21          THE COURT:  That is correct, sir.

22          MR. FOLLY:  Okay.  Thank you.

23          THE COURT:  Mr. Folly, from the government's

24  perspective, is there anything else that I should have?

25          MR. FOLLY:  Your Honor, I believe there was one

1   additional filing made today by Mr. Quinones.  That was Docket

2   No. 111.

3              THE COURT:  Ah.

4              MR. FOLLY:  And I want to confirm that your Honor has

5   that as well.

6              THE COURT:  I had a suppression hearing until right

7   before this, so let me take a moment then to make sure I

8   reviewed this.  Thank you.

9              MR. MASSENA:  Thank you.

10             THE COURT:  Mr. Folly, you've seen this submission,

11  sir, yes?

12             MR. FOLLY:  Yes, your Honor.

13             THE COURT:  Perhaps you could help me understand it,

14  because to either confirm with the parties or to remind the

15  parties, my own review of the docket indicates that in November

16  of 2018, there was a motion for a cautionary notice on these

17  properties.  That was a motion that was contested by the

18  defense, particularly an opposition in March of 2019.  But

19  thereafter, I agreed with the government in a hearing that was

20  held in May, and then in June I entered the order.  So I guess

21  what confuses me is, I had been operating under the assumption

22  that the government was not aware of the transmission of the

23  power of attorney to a third party or of the sale of the

24  property.  Based on the document that I see from Mr. Epstein's

25  files, Mr. Folly, you were aware that a power of attorney had

been granted in favor of a third party, but perhaps you did not

understand that this property was being sold.  So tell me,

please, what you can, because what I'm really trying to figure

out is, if this happened and the government did not know about

it, I have one set of views; if this happened and the

government did know about it, I might have another set of

views; and if this happened and the government was absolutely

fine with it, I might have still another set of views.  So

Mr. Folly, do you recognize the email discussions, that

particular email that is included as an exhibit to

Mr. Massena's letter?

          MR. FOLLY:  Yes, your Honor.  So I'll do my best to

add some context and clarity, to the extent possible, on this

issue.

          We did become aware at a certain point in time about

the power of attorney that's referenced therein.  Sitting here

right now, I don't have the precise date that we became aware

of that, but certainly by the time of this email exchange, it's

clear to me that we were aware of it.  The government never

authorized any sale of that property, and I think that's --

there's a partial window into that in this email exchange,

where it says, in bold, underlined, that we have not provided

authorization for that sale.  And as your Honor is aware, at

this juncture in time, the property had been included in your

Honor's consent preliminary order of forfeiture.  We never gave

1  authorization for the sale of the property, that communications

2  with the parties that are referenced in this email stopped.

3  Unbeknownst to the government, the sale did go forward without

4  the government's authorization or awareness.

5           THE COURT:  So who is Maria Luisa Inserni?  Is she an

6  attorney?  Is she a real estate agent?  What was her role?  She

7  makes reference to clients of hers being the buyers of this

8  property.

9           MR. FOLLY:  Yes.  Your Honor, our understanding -- it

10  was represented to us, I believe, that she was I believe an

11  attorney, although I'm not -- that's my recollection.  I don't

12  recall that there was any independent verification of that, but

13  that is what was communicated to the government, and that she

14  represented the buyers in connection with the sale.

15           THE COURT:  All right.  So she says, basically, my

16  clients are buyers and they're ready to do this.  And there was

17  a power of attorney; and you say, Mr. Quinones has no authority

18  to sell without our consent, we're not giving it; and she says,

19  I await, as do my clients.  I presume she's awaiting the

20  consent.  And she notes, helpfully, in case you need to know,

21  that of course the proceeds can be assigned directly to the

22  Marshals Service, which is not the same thing as getting your

23  consent.  Did she thereafter just sell the property without

24  anybody on the prosecution team giving consent?  And if so, how

25  come you're not getting it back from the buyers?

XLCG1QUI                        SEALED

1          MR. FOLLY:  So, your Honor, our office does have every

2     intention of getting the properties back.

3          THE COURT:  I see.  Okay.

4          MR. FOLLY:  I'm doing my best on memory, so I want to

5     make that clear, but my recollection is --

6          THE COURT:  But sir, this is sufficiently important to

7     me that I'm hoping you're prepared to speak to this.

8          MR. FOLLY:  Yes, your Honor, absolutely.  But my

9     recollection is, if you asked as to this individual Maria Luisa

10    Inserni, I believe that she may have actually at a certain

11    point in time stopped representing these individuals and did

12    not participate in the sale.

13         THE COURT:  I see.  So I first learned about the sale

14    of this property in connection with this sentencing.  At least

15    that's the best of my recollection.  When did the government

16    learn that the property had been sold?

17         MR. FOLLY:  I don't have that -- I don't have a date

18    so I don't want to estimate when we first learned about it.

19         THE COURT:  Okay.  Just one moment, please, sir.

20         MR. MASSENA:  Your Honor, if --

21         THE COURT:  Just one moment, please, sir.  Thank you.

22         I'm looking at the various requests for extensions in

23    this case, and I believe that the requests for extensions were

24    predicated first on the COVID-19 pandemic and then on the need

25    to obtain new counsel for Mr. Quinones.  I don't know that

XLCG1QUI                    SEALED

1   there was ever a request predicated on the government's

2   learning about this information, but perhaps there was.

3             MR. FOLLY:  I'm fairly certain that there was.

4             THE COURT:  There was eventually.  All right.

5             MR. FOLLY:  It was in at least one or more of our

6   letters.

7             THE COURT:  Okay.  That's fine.  Thank you.  And we'll

8   figure out which one that is.

9             Mr. Massena, do you wish to add something?

10            MR. MASSENA:  No, your Honor.  I know the Court was

11  looking for some sort of timeline.  I know that at the very

12  least the government was aware that the property was sold by

13  March or February of 2020.

14            THE COURT:  I'm sorry.  2020?

15            MR. MASSENA:  2020.

16            THE COURT:  And sir, what is the document that you're

17  looking at that gives you that time frame, please?

18            MR. MASSENA:  I was looking at an investigatory report

19  by the agents, the government's agents, regarding the sale of

20  the property.

21            THE COURT:  I see.  Okay.

22            Yes, I see.  February 10th of 2020 is what I'm being

23  advised.  I misspoke earlier by suggesting that the

24  adjournments were predicated in the first instance on the

25  pandemic.  We were not yet aware of the pandemic when the first

1    adjournment was requested in February of 2020.

2            And Mr. Folly, just to confirm, it is the government's

3    intention to try and undo this sale?

4            MR. FOLLY:  Your Honor, yes.  We have had several

5    conversations with the supervisors of the asset forfeiture unit

6    and we do have the intention of seeking to -- I don't know what

7    the formal process is, but to get the property back, title back

8    in the United States, to the United States.

9            THE COURT:  Thank you.

10           Okay.  Now I've gotten us off track, which is not my

11   intention.  Mr. Folly, you correctly pointed out that today's

12   letter was a letter that I should have included, and now I have

13   looked at it.  So to the best of your understanding, should

14   there be anything else that I should have in connection with

15   sentencing?

16           MR. FOLLY:  No, your Honor.

17           THE COURT:  Thank you.

18           And Mr. Massena, from your perspective, sir, anything

19   else I should have in connection with sentencing?

20           MR. MASSENA:  No, your Honor.  Mr. Folly brought up

21   the letter.

22           THE COURT:  Yes.  Thank you.

23           Mr. Folly, has the government had -- and I suspect the

24   answer to this question is yes -- has the government had a

25   sufficient opportunity under Federal Rule of Criminal Procedure

1    32 to review the presentence investigation report in this case?

2                MR. FOLLY:  Yes, your Honor.

3                THE COURT:  There have been some suggested changes to

4    that report, so I'd like to review those with the parties.  But

5    actually, if the parties will indulge me, I'd actually like to

6    just step back a moment.

7                Mr. Massena, you've asked me, I think, in recent weeks

8    to strike certain materials from the record, but then some of

9    those materials I believe were things that you've also asked to

10   incorporate in your sentencing submission.  So it may be that

11   what you're actually asking is for something to be sealed.  I

12   just want to make sure I understand what you think I can and

13   cannot consider.  And then separately, sir, I believe that

14   there may be one portion, if not two portions, of today's

15   sentencing that might involve sensitive information, and I'm

16   wondering if, when those opportunities present themselves, if

17   you would want the transcript to be sealed in part.

18               MR. MASSENA:  To your second question, yes, your

19   Honor.  I usually ask for that towards the end, but I will ask

20   for that now, as to the two sensitive portions, which one

21   refers to ███████████████████████, and two refers to ████

22   ████████████████  I would ask that those two portions be sealed.

23               And your Honor, as to your first question regarding

24   the striking, or I guess more appropriate would be sealing, I

25   believe it was Docket 63 and Docket 107.  I came to learn that

1   sensitive information was contained in those documents, so I

2   would ask that they be sealed, your Honor.

3             THE COURT:  Does the government have any opposition to

4   the sealing of docket entries 63 and 107?

5             MR. FOLLY:  No, your Honor.

6             THE COURT:  Those materials are sealed and not

7   stricken.  I have considered them.  I will continue to consider

8   them.  Mr. Massena, I appreciate the clarification.

9             MR. MASSENA:  Thank you.  However, your Honor, I did

10  file 108 replacing 107.

11            THE COURT:  I did see that.

12            MR. MASSENA:  And I thought that would be the cleaner

13  way to do it, Judge.

14            THE COURT:  Perhaps, yes.  Let's keep 63 and 107 under

15  seal.  Thank you.  Okay.

16            MR. MASSENA:  Thank you, Judge.

17            THE COURT:  Mr. Massena, Mr. Epstein noted proposed

18  changes to paragraphs 7, 72, and 91.  Are you adopting those

19  requests, sir?

20            MR. MASSENA:  Yes, your Honor.

21            THE COURT:  And Mr. Folly, are you familiar with the

22  requests?  I can also summarize them if need be.

23            MR. FOLLY:  Your Honor, if you wouldn't mind

24  summarizing them.

25            THE COURT:  That's fine.

1          The issue with paragraph 7, as I understand it, is

2    that when there is discussion of the forfeiture obligation, the

3    defense believes that the proper way of calculating them is as

4    a forfeiture obligation of $232,500, satisfied in part by the

5    sale of the property, which may end up being a moot point,

6    whereas at least paragraph 7 as it now stands suggests both

7    that Mr. Quinones is to pay this money and that he must also

8    forfeit the property.  So perhaps I should understand better

9    the forfeiture obligation.  I thought it was a numerical

10   figure, $232,500, which might end up being satisfied in whole

11   or in part by the sale of the properties.  Is it the

12   government's view that there is both a monetary component and

13   the property component?

14        MR. FOLLY:  Your Honor, my understanding is consistent

15   with yours, that he has agreed to forfeit -- well, the

16   specifics on the current view, which is the $232,500, as well

17   as all right and title and interest in that property, and that

18   the money judgment could be satisfied by the sale of that

19   property.

20        THE COURT:  Okay.  I'll make sure that we track the

21   language of the plea agreement.

22        With respect to paragraph 72 -- I don't think you have

23   objections to this, sir -- the names of certain family members

24   are presented incorrectly.

25        And then in paragraph 91, there's a reference to a

1   Santos, who is in fact Mr. Quinones.

2               MR. FOLLY:  Yes, your Honor.  We have no objection to

3   those revisions.

4               THE COURT:  All right.  I will order those changes to

5   be made to the presentence investigation report.

6               Mr. Folly, you included in the government's sentencing

7   submission three paragraphs regarding post-indictment conduct.

8   I understood that that material or that information was

9   information on which the parties had agreed and that it was the

10  government's request that the three paragraphs be entered into

11  or included in the presentence investigation report.  Did I

12  understand that correctly?

13              MR. FOLLY:  Your Honor, yes.  And I would like to

14  clarify, I've had further discussions with Mr. Quinones's

15  counsel to make sure that we are in full agreement on this

16  issue.  There is one sentence, the very last sentence of the

17  second paragraph, which is on page 3 of the government's

18  sentencing submission --

19              THE COURT:  Yes, sir.

20              MR. FOLLY:  -- which says the government received no

21  such communications.

22              THE COURT:  Yes.

23              MR. FOLLY:  Your Honor, we've --

24              THE COURT:  Given the --

25              MR. FOLLY:  -- seen the paragraph.  It seems that

XLCG1QUI                        SEALED

```
 1   there is a dispute about the characterization of the language
 2   that's used there.
 3                THE COURT:  Yes.
 4                MR. FOLLY:  Your Honor, the government does not
 5   believe that it's necessary to include that specific assertion
 6   in the amended PSR and we would therefore, with the consent of
 7   the defendant, propose the inclusion of those paragraphs with
 8   the exception of that sentence.
 9                MR. MASSENA:  We join in that application.
10                THE COURT:  I will include the three paragraphs minus
11   the last sentence of the second paragraph.  Correct?  "The
12   government has received no such communications"; that's the
13   sentence to delete?
14                MR. FOLLY:  Yes, your Honor.
15                THE COURT:  That will be deleted.  Thank you.
16                MR. MASSENA:  Your Honor --
17                THE COURT:  Just one moment, please, sir.  Thank you.
18                Actually, Mr. Massena, I'll hear from you.
19                MR. MASSENA:  Your Honor, I don't know if you were
20   wrapping up in terms of objections or --
21                THE COURT:  I'd like to hear from the parties
22   regarding the calculation of the guidelines.
23                MR. MASSENA:  All right.
24                THE COURT:  So whichever of you speaks first is fine.
25   Mr. Massena, I was actually going to get to you next and ask
```

1   you the same exact questions, so perhaps I can do that.  I'll

2   finish with Mr. Folly and then turn to you.

3           Mr. Folly, there's an inclusion in the probation

4   office's presentence investigation report of a two-level

5   enhancement for the use of violence or a credible threat of

6   violence.  That's not included in the plea agreement.  I'm not

7   asking the parties to violate their obligations under the plea

8   agreement.  I'm asking, however, why the probation office is

9   wrong in including it, because my recollection of the

10  sentencing with Mr. West causes me to recall extensive

11  discussion about abuse perpetrated on Mr. West by Mr. Quinones,

12  including locking him in a car trunk for several days, after

13  beating him with a gun, and so -- Mr. Quinones, you will stop.

14          THE DEFENDANT:  Sorry.

15          THE COURT:  Take this seriously, sir.  This is

16  serious.

17          THE DEFENDANT:  I am taking it seriously, but I just

18  can't believe that he said that because that never happened.

19          THE COURT:  Mr. Folly, again, that was represented to

20  me at the sentencing.  It was also contained in the presentence

21  investigation report.  If the government's view is that the

22  cooperator was mistaken about this, please tell me.  If there's

23  some other reason why the government is not including this

24  enhancement, please tell me.  But based on my sentencing of

25  Mr. West and what I understood to be included in that

XLCG1QUI                    SEALED

1   presentence investigation report, and this one, I would like to

2   understand why it is the government's belief that the

3   enhancement is not warranted.

4           MR. FOLLY:  Yes, your Honor.

5           As your Honor indicated, the government is standing by

6   the plea agreement and the stipulated guidelines therein and

7   the calculation.

8           With respect to paragraph 43 that your Honor is

9   referencing, the government understands that probation has

10  included that.  I believe that's likely as a result of the

11  information contained in paragraph 18 --

12          THE COURT:  Correct.

13          MR. FOLLY:  -- which does make reference to

14  Mr. Quinones's physical beating of another member of the drug

15  trafficking organization.  Your Honor, we understand why

16  probation has reached that conclusion.  However, we do still

17  stand by the plea agreement and the stipulated guidelines

18  therein.

19          THE COURT:  Mr. Folly, let me ask you the question a

20  little bit differently.  Paragraph 18 indicates that

21  Mr. Quinones had a gun, threatened violence, and beat up at

22  least one other member of the conspiracy.  Is that sentence in

23  the presentence investigation report incorrect?

24          MR. FOLLY:  No, your Honor.  We're not challenging it.

25  We agree that the factual representations in paragraph 18 are

 1   correct, and we also understand that defense counsel is not

 2   disputing those factual assertions either.

 3          THE COURT:  Okay.  All right.  Thank you, sir.  Just

 4   please give me a moment to make sure I've asked you all of my

 5   questions about the presentence investigation report.

 6          Okay.  Mr. Massena, I appreciate your patience, sir.

 7   Have you and has your client had a sufficient opportunity under

 8   Federal Rule of Criminal Procedure 32 to review the presentence

 9   investigation report in this case?

10          MR. MASSENA:  Yes, your Honor.

11          THE COURT:  And we have made some changes to

12   paragraphs 7, 72, and 91, and then the addition we've just

13   talked about.  Apart from those, sir, does the defense have any

14   objections to the contents of the presentence investigation

15   report?

16          MR. MASSENA:  Yes, your Honor.  And it's specifically

17   to paragraph 18.  I don't know if we need to go into depth.

18   However, Mr. Epstein's sentencing memorandum reflects that it's

19   our position that the plea agreement calculation should

20   control, and that --

21          THE COURT:  One moment, please, sir.  And of course,

22   that would counteract the assessment in paragraph 43.

23          MR. MASSENA:  Correct.

24          THE COURT:  My question is a little bit different,

25   which is, if I could just be really pointed about it:  Did

1   Mr. West lie to me, sir?

2           MR. MASSENA:  Your Honor, my client has indicated to

3   me that he never hit Mr. West with a gun.  He did indicate that

4   he got into -- he did get into a dispute and a fight, a

5   physical altercation, with Mr. West, but that was over 14 years

6   ago and it was not related to the drug trafficking

7   organization.

8           THE COURT:  And he didn't put him in the trunk of a

9   car?

10          MR. MASSENA:  He did not put him in the trunk of a

11  car.

12          THE COURT:  It matters to me.  I mean, I had a whole

13  sentencing on this, so I'm surprised to hear this.  All right.

14  I'm not sure that it is worth it for me to have a *Fatico* on

15  this issue, but I understand that my options are to either

16  credit Mr. West and discredit your client, to do the opposite

17  of that, or to conclude that the particular paragraphs will not

18  impact my ultimate sentencing decision.  If there is another

19  option I have available to me, I welcome hearing about it from

20  the parties, but I think those are my options.

21          Mr. Folly?

22          MR. FOLLY:  Your Honor, I agree that those are the

23  Court's options.

24          THE COURT:  Okay.  Thank you.

25          Mr. Massena?

1        MR. MASSENA:  I agree those are the Court's options as

2    well.

3        THE COURT:  Mr. Massena, other than that objection,

4    which I wish I had known about before this, are there other

5    objections to the content of the presentence investigation

6    report?

7        MR. MASSENA:  No, your Honor.  And your Honor, the

8    reason why counsel did not bring that to the Court's attention

9    is because the parties had agreed to honor the new

10   calculations.  Therefore, delving into the facts, even if he

11   did have a physical altercation with Mr. West, delving into the

12   facts, the detail of the violence -- and I understand the

13   violence is important to your Honor -- didn't change the

14   calculations that we had agreed to.

15       THE COURT:  That explains the failure to contest

16   paragraph 43.  It doesn't quite explain the failure to contest

17   paragraph 18, because that is very significant to me.  But I

18   will see what I do with it.  Thank you.

19       Mr. Massena, at the back of the presentence

20   investigation report are mandatory, standard, and special

21   conditions of supervised release.  My deputy advises me that

22   you and your client have reviewed those conditions; is that

23   correct?

24       MR. MASSENA:  That is correct, your Honor.

25       THE COURT:  With particular respect to the special

XLCG1QUI                          SEALED

1  conditions, sir, which include a search condition, a condition

2  of treatment or testing for drugs or alcohol use, and a

3  recommendation of supervision in the district of residence, do

4  you have an objection to any of those conditions?

5          MR. MASSENA:  No, your Honor.

6          THE COURT:  May I speak with your client directly

7  about the presentence investigation report?

8          MR. MASSENA:  Yes, your Honor.

9          THE COURT:  Thank you.

10          Mr. Quinones, you've heard me speaking with your

11  attorney, and with the attorney for the government, for a while

12  now, about the presentence investigation report.  Were you able

13  to follow what we were discussing?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  And my understanding is that you and your

16  attorney have reviewed the presentence investigation report in

17  this case; is that correct?

18          THE DEFENDANT:  Yes, your Honor.

19          THE COURT:  He has advised me of several paragraphs

20  for which he would like modifications or corrections.  Were you

21  able to listen to us talk about those?

22          THE DEFENDANT:  Yes, your Honor.

23          THE COURT:  Other than those, sir, are there other

24  paragraphs that you have objections to?

25          THE DEFENDANT:  No.

XLCG1QUI                          SEALED

1              THE COURT:  At the back of the report, sir, are

2      mandatory, standard, and special conditions of supervised

3      release.  I understand that before this proceeding you were

4      able to review those with your attorney; is that correct?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  There are special conditions I was

7      speaking about with your attorney which include a search

8      condition under certain circumstances, a drug testing or

9      alcohol testing or treatment condition as appropriate, and a

10     recommendation that you be supervised in your district of

11     residence.  Is that correct, sir, that you reviewed those

12     conditions with your attorney?

13             THE DEFENDANT:  Yes, your Honor.

14             THE COURT:  He advises me that you have no objection

15     to those conditions; is that correct?

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  If I refer to these conditions as a group,

18     if I call them the mandatory, the standard, and the special

19     conditions of supervised release, without reading them word for

20     word into the record, will you understand what I'm talking

21     about?

22             THE DEFENDANT:  Yes.

23             THE COURT:  May I do that?  May I refer to them as a

24     group without reading them word for word into the record?

25             THE DEFENDANT:  Yes, your Honor.

XLCG1QUI                    SEALED

```
1              THE COURT:  I thank you.  I imagine that there are

2    corrections to be made to the presentence investigation report,

3    so I will hold off on that document at this time.

4              Mr. Folly, I'd like to hear from the government

5    regarding sentencing in this case.  I think you have a sense of

6    some of the issues that have been occupying my time lately.  I

7    also would like you to comment -- and we will seal that portion

8    of the transcript -- on the discussions or the assertions that

9    the defense has made regarding ██████████████████████

10             MR. FOLLY:  Yes, your Honor.

11             First and foremost, your Honor, it's clear, and there

12   does not appear to really be much of a dispute, that the

13   defendant engaged in extremely serious criminal conduct.  He

14   was involved for a period of approximately two years in a

15   heroin and fentanyl drug trafficking organization.  He occupied

16   a manager role in that organization and oversaw numerous

17   street-level drug dealers, and there really is no dispute about

18   that.  He also, in the course of that conspiracy, carried a

19   gun, and there is no dispute about that.  Your Honor is

20   familiar more generally with the nature of this drug

21   trafficking conspiracy.  The defendant and his co-conspirators

22   were primarily engaged in street-level sales, and the

23   defendant, as I indicated before, was responsible for

24   overseeing the logistics of that operation.

25             I would note the defendant, during the course of this
```

1    conspiracy, did use a basement of a residential building to

2    conduct part of the drug trafficking operation out of.

3              THE COURT:  And I believe from reading the sentencing

4    materials that his family or his mom did have an interest in a

5    building at one point.  This is not a building in which any

6    family member had an interest?

7              MR. FOLLY:  Your Honor, not to my knowledge.  I'm not

8    aware of that.

9              THE COURT:  And the folks behind you are shaking their

10   heads no as well.  I appreciate knowing that.  Go ahead, sir.

11             MR. FOLLY:  And I mention that because I do think it's

12   relevant to the conduct that he chose to conduct a portion of

13   it right in the mix of ordinary, everyday civilians and brought

14   all the associated dangers of that operation right into an

15   apartment building by doing that.

16             The defendant's business was quite lucrative.  It's

17   clear he made at least $232,000 from that operation.  That's

18   not an insignificant amount of money.  He was not making the

19   amount of money that a purely street-level dealer would make.

20   He was making an amount that seems to reflect his position,

21   which was, although not at the very top as a leader of the

22   whole operation, more rightfully in the middle as a manager who

23   was supervising a crew of street-level drug dealers, and was

24   being compensated significantly for doing that.

25             We noted -- and I believe it's relevant -- that during

1    the course of this conspiracy, members of the DTO learned that

2    narcotics that had the same stamp as the defendant's

3    organization was using had been linked to an overdose, and the

4    defendant's response to that was to switch the stamp.  Your

5    Honor, that did strike me as a juncture where there really was

6    the chance to have a wake-up call in recognition of the

7    seriousness of what the defendant was engaged in and the real

8    effects that that could have on people's lives.  Ultimately the

9    government did not, in the course of its investigation, learn

10   of sufficient evidence to link that particular overdose to

11   drugs the defendant was dealing, but it's clear that they had

12   an understanding and awareness that their drugs may have caused

13   an overdose and took steps in response to that with that

14   knowledge in mind to avoid being linked to it.  And I think

15   what that goes to, from the government's perspective, is,

16   again, an awareness of the seriousness of the harm that could

17   be caused by dealing these drugs and then thereafter the

18   decision to keep doing it instead of stepping back from the

19   operation.

20          Your Honor, the conduct that took place after the

21   defendant was charged, in the government's view, is

22   significantly relevant to sentencing today.  And it's clear

23   that the defendant helped to facilitate the sale of this

24   property that was subject to forfeiture and arranged for

25   someone to travel to Puerto Rico and get the cash proceeds from

1   that sale, which are gone.  They were never provided to the

2   government.  The government does not know where that money

3   went, although it's clear some of it went to the defendant's

4   friends and family.

5          THE COURT:  There's a suggestion, sir, in the

6   materials related to the plea -- and perhaps this was a

7   misapprehension that I had, but I thought I understood from

8   Mr. Epstein that the sale of these properties would more than

9   cover the forfeiture figure, and yet if the forfeiture figure

10  was $232,500, the sale was at $175,000, so my question is

11  whether the government has reason to believe that this sale was

12  below market so that it could be conducted in the face of any

13  notices or what I consider to be clouds on the title.

14         MR. FOLLY:  Your Honor, it seems certainly possible

15  that that's the case, particularly given that our understanding

16  is that this was a cash sale for $175,000, which, based on

17  appraisals that the government had, was below market.  And not

18  to get back into this, but that was part of the reason the

19  government had not, up until that point in time, consented to

20  the sale is that our understanding of the terms of it were that

21  they were below the value of the property.

22         It is particularly concerning that despite being

23  charged in this case, entering a guilty plea, and facing the

24  prospect of sentencing, that the defendant was still in the

25  mind-set of trying to use criminal proceeds however he saw fit,

1  despite having a court order that that money was not rightfully

2  his and that it belonged to the government.

3          THE COURT:  And sir, just so that I understand

4  something you said a moment ago, you said that the government

5  understood the sale to be below market and that's why you did

6  not consent to it.  Was there a possibility -- let's say the

7  sale had been for a million dollars, something that I think we

8  all concede is above market.  Would the government have

9  consented to that sale?  Because I'm not sure that all of the

10  niceties of forfeiture had actually taken place.

11          MR. FOLLY:  Your Honor, my understanding is that there

12  is a mechanism that has been used in other cases where in that

13  situation we would come back to the Court, we would in fact get

14  a new court order that would authorize the sale, and that there

15  would be specific terms of the sale that had to be adhered to,

16  including that the proceeds from the sale were immediately

17  wired to the Marshals or to an escrow account for an attorney

18  connected to the sale.  All of that is to say, my understanding

19  is that there is a way to do it.  It can be facilitated.  It

20  would involve an order from the Court.  It would also involve

21  consultation with the Marshals, who would typically be given

22  some right to approval in connection with the sale so that they

23  can ensure that it was at fair market value or close to fair

24  market value.

25          Your Honor, another deeply troubling aspect of this

XLCG1QUI                         SEALED

1   case, going back to the concept of deterrence and specific

2   deterrence as to this defendant, is that this defendant had

3   engaged in a substantially similar heroin conspiracy previously

4   and been sentenced to a significant term of imprisonment of

5   what I believe was 84 months' imprisonment, and that despite

6   serving that sentence, after being released, began

7   participating in the instant drug conspiracy with a member of

8   that prior conspiracy, as your Honor is familiar with the

9   co-defendant Michael West.  The combination of the defendant's

10  criminal history, serving a substantial sentence on a very

11  similar case, being released from that sentence, choosing to

12  return to drug distribution, particularly heroin, and in

13  addition, the defendant's conduct while this case was pending,

14  all give the government significant concern about the need to

15  deter this defendant and also protect the community and the

16  public from further crimes by this defendant.

17  ████████████████████████████████████

18  ████████████████████████████████

19  ██████████████

20  ████████  ██████████████████████████

21  █████

22  ████████  ██████████

23  ██████████████████████████

24  ██████████████████████████

25  ██████████████████  ████████████████

XLCG1QUI                          SEALED



XLCG1QUI                         SEALED



SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

XLCG1QUI                              SEALED



1  ███  Ultimately, your Honor, Mr. Quinones proffered

2  information to the government regarding the property in Puerto

3  Rico and provided them with the town where they could find it.

4        THE COURT:  Sir, I would be so careful if I were you

5  talking about the property in Puerto Rico.

6        MR. MASSENA:  I'm not going to talk about it anymore.

7  Thank you, Judge.

8        THE COURT:  I'm just saying, I find it offensive what

9  your client did after I signed a series of orders about it and

10  after putting everyone through the drama of motion practice on

11  the issue.  He clearly knew it was inappropriate.  So I know

12  you want me not to think about it, but I am thinking about it.

13  So I'd be careful how often you make mention of it, and how you

14  do so.  But I'll let you continue.

15        MR. MASSENA:  I appreciate that, your Honor.

16        And I tread lightly with this particular point as

17  well, your Honor, regarding the violence, which I know is very

18  concerning to the Court.  What I will say, your Honor, is, as

19  it relates to the violence, the government has brought forward

20  one particular instance of violence, as far as I'm aware of,

21  and that's the violence regarding a co-conspirator.  Your Honor

22  has had the opportunity to hear hundreds if not thousands of

23  cases involving drug traffic organizations.  And I would

24  submit, your Honor, very carefully -- as I said, I tread very

25  carefully with this particular point -- that the level of

1   violence involved here does not rise to the level of the type

2   of drug traffic organization that the Court typically hears.

3   Obviously any level of violence is unacceptable, and

4   Mr. Quinones understands that, and he accepts responsibility

5   for his role in any violence alleged.  However, your Honor, I

6   would ask that the Court consider that the government putting

7   forth this simple instance, although it may be serious,

8   considering the breadth of the types of drug trafficking

9   organizations this Court has had an opportunity to hear, that

10  the violence, I would submit, is somewhat less than the typical

11  case, your Honor.

12          And also, as it relates to the overdose, the

13  allegation of overdose, Mr. Quinones submits that he did not

14  have control regarding the changing of any stamps, your Honor,

15  so I just wanted to make the Court aware of that as well.

16          THE COURT:  Of course.  But was he obligated to remain

17  in the organization after the incident?

18          MR. MASSENA:  Obviously not, your Honor.

19          THE COURT:  Thank you.

20  ██████████████    ████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████████     ██████

23  ██████████████████████████████████████████████████

24  ████████████████████████    ████████████████████████

25  ████████████████     ████████████████████████████████

1  ████████████████████████████████████████████████████

2  ████████████████████████████████████

3          And while we're discussing the trauma faced by

4  Mr. Quinones, I point to the fact that he also faced trauma

5  while being incarcerated at MDC.  And the Court is very well

6  versed in the horrific nature, the inhumane nature that

7  Mr. Quinones had to deal with while he was at MDC.

8          But despite that, your Honor, Mr. Quinones did make an

9  attempt to better himself and to better his skills.  The Court

10 has within the sentencing submission numerous letters of

11 support from inmates who indicate regarding the kindness of

12 Mr. Quinones.  The Court also has letters from counselors at

13 MDC that also speak highly of Mr. Quinones as well.  I believe

14 that these should weigh as well into the Court's consideration

15 of what an appropriate sentence is.

16         We are asking for the ten-year minimum for

17 Mr. Quinones.  Ten years is a significant amount of time, your

18 Honor.  It will be the longest amount of time that Mr. Quinones

19 will have faced incarcerated.  It does meet the aims of

20 specific deterrence and general deterrence, especially when one

21 considers the conditions that Mr. Quinones had to face while

22 incarcerated at MDC, your Honor.

23         THE COURT:  Thank you.  I believe I've asked the

24 questions along the way I've had.  Is there anything else you'd

25 like me to know?

1        MR. MASSENA:  No, your Honor.  Oh, just one moment,

2   your Honor.

3        THE COURT:  Of course.

4        (Mr. Massena conferring with the defendant)

5        MR. MASSENA:  No, your Honor.  Thank you.

6        THE COURT:  You're good, sir?

7        MR. MASSENA:  Thank you, Judge.

8        THE COURT:  Okay.  Thank you.

9        Mr. Quinones, at this time if you'd like to speak to

10  me in connection with your sentencing, you are invited to do

11  so.  I have to make clear that you are not obligated to speak

12  with me, sir, but you are welcome to do so, and if you want to

13  say something, I'll take it very seriously.  Would you like to

14  say something?

15       THE DEFENDANT:  Could I read my letter?

16       THE COURT:  Is it a letter that you've given to me?

17       THE DEFENDANT:  I gave you two letters, but this is

18  something I just wrote.  I don't want to take too long.

19       THE COURT:  I'll welcome you reading it.  And what

20  I'll ask, sir -- and I've just had this experience -- the masks

21  make it difficult sometimes to hear, so if you could speak a

22  little slower and a little louder than you think you need to.

23  And you'll excuse me if I interrupt you from time to time so I

24  can take notes on what you're saying.

25       If you'd like to read that letter, you're welcome to

1    do so now.

2              THE DEFENDANT:  Thank you, your Honor.

3              Thank you, your Honor, for giving me this opportunity

4    to address the Court.  I would like to start by sincerely

5    apologizing to anyone who I may have hurt or affected with the

6    stupid and negative decisions I have made throughout my life.

7              THE COURT:  I'll just ask you to slow down a little

8    bit, sir.  I can't keep up with you.  Thank you.

9              THE DEFENDANT:  Should I start over?

10             THE COURT:  No.  I've got that so far.  Thank you.

11             THE DEFENDANT:  -- stupid and negative decisions I

12   have made throughout my life.

13             I also want to sincerely apologize to my fellow

14   Americans, to the government, and to the Court for being part

15   of the problem instead part of the solution.

16             Your Honor, I know that the Court is aware that this

17   is not my first time in this predicament so I dare not stand

18   here before you, your Honor, and give excuses.  All I can truly

19   say is that my past incarcerations, I was young, stupid, and

20   ignorant.  But this time around, due to my age, my diagnosis of

21   Type 2 diabetes, the things I have been through and witnessed

22   in the three and a half years I've been incarcerated at MDC

23   Brooklyn so far --

24             THE COURT:  Slow down, please, sir.  I know it's very

25   important what you have to say.  I want to make sure I'm taking

1    notes on it.  Thank you.

2                 THE DEFENDANT:  Okay.

3                 THE COURT:  Go ahead.

4                 THE DEFENDANT:  Okay.  In my past incarcerations I was

5    young and stupid and ignorant.  But this time around, due to my

6    age, my diagnoses of Type 2 diabetes, the things I have been

7    through and witnessed in the three and a half years I've been

8    incarcerated at MDC Brooklyn so far, and, of course, the

9    coronavirus pandemic, has made me see and think of life a whole

10   lot differently.

11               Your Honor, I am not going to stand here and waste the

12   Court's time any longer than I already have by telling you

13   things I am pretty sure you have heard over and over again from

14   other inmates, such as how MDC Brooklyn is a very dangerous

15   drug- and gang-infested place, with lots of gang violence

16   happening all the time, how inmates were left hungry and cold

17   during a week-long power outage that occurred at MDC in

18   Brooklyn in the winter of 2018, and how inmates have been

19   mistreated during the coronavirus pandemic by being put

20   constantly on 24-hour lockdowns that lasted for months, the

21   spoiled food that was given out on multiple occasions, and so

22   much more.

23               Your Honor, it is very true that I have suffered

24   tremendously mentally and physically in the past three and a

25   half years I've been incarcerated at MDC Brooklyn, but I want

XLCG1QUI                    SEALED

1    to clarify to the Court that I blame no one for my suffering.

2    I don't blame the administration at MDC Brooklyn for not

3    handling the power outage and the coronavirus pandemic

4    differently than they did; I don't blame the gang members for

5    all the violence and drugs that flows freely at MDC Brooklyn; I

6    don't blame nobody for me catching COVID-19 and all the stress

7    that came with it.  I blame no one.  I have no one to blame but

8    myself for everything I've been through in the past three and a

9    half years of my incarceration.  I know if I would have been

10   out there doing the right thing instead of using and dealing

11   drugs, I would have never been -- I would have never been put

12   in those predicaments.

13            But in a way, I needed all those things to happen to

14   me so that I can really learn my lesson, which I have.  Using

15   and dealing drugs is never the way to go.  Using and dealing

16   drugs has gotten me nowhere but thrown in prison and has taught

17   me nothing but heartache and pain.  I'm done with using -- I'm

18   done with dealing and using drugs.

19           I am going to be 47 years old in two weeks.  I know

20   it's time I put all childish things behind me and act like a

21   man.  In the past, I never had a plan on what I was going to do

22   when I was released, but this time I do.  With the Court's

23   permission, when I am done serving my prison sentence, I would

24   like to be relocated to Puerto Rico, where I have family that

25   are willing to help me out with residency and employment.  I

1  plan on living in Puerto Rico, working hard for the things I

2  need, and just starting life anew, living a sober and drug-free

3  life, because the life I've been living is no life at all.

4          Thank you, your Honor, for giving me this opportunity

5  to address the Court.

6          THE COURT:  Sir, thank you very much.

7          Mr. Massena, in light of your client's statements to

8  me, is there anything you wish to add?  That's not a hint, sir.

9  I just want to make sure I have everything from both sides

10  before I retire to my robing room to think about the proper

11  sentence.

12          MR. MASSENA:  No, your Honor.

13          THE COURT:  Thank you.

14          Mr. Folly?

15          MR. FOLLY:  Your Honor, just very, very briefly, just

16  because I do think it's relevant to an issue that was raised

17  earlier with respect to paragraph 18 in the PSR and this

18  question about the violence.  Your Honor, I just want to

19  note -- because I don't think it is in dispute at all -- when

20  the defendant was arrested, that he had a loaded 9-millimeter

21  gun, and that's reflected in the plea agreement with the gun

22  enhancement.  And your Honor, just to sort of add that context,

23  the government doesn't think that it's necessary for there to

24  be any crediting of Mr. Quinones versus crediting of Mr. West

25  on this issue, in light of the fact that there's an even more

1  significant issue with respect to the willingness to use

2  violence and the possession of a firearm during the course of

3  this conspiracy.  So your Honor, I just wanted to flag that and

4  put that on the record because I do think it's relevant to the

5  Court's consideration of the defendant's willingness to use

6  violence as reflected by his possession of that gun during the

7  course of the conspiracy.

8          THE COURT:  Of course.  And there was an enhancement

9  for the possession of the gun.  The issue is, is there an

10  enhancement warranted because of the use.  It's one thing to

11  have it; it's another thing to use it.  The government, I

12  appreciate, did not include it in the plea agreement.  But I

13  had a sentencing of an individual who, to my mind, came before

14  me broken.  Mr. West is not right anymore, and in part he says

15  it's because of the episode in the trunk of the car.  So if the

16  parties are claiming now I should just completely put out of my

17  mind the fact that a chunk of the sentencing was about the

18  trauma that Mr. West experienced or told me he experienced at

19  the hands of Mr. Quinones, I will try very hard to do that, but

20  you telling me that he was arrested with a gun is different

21  than telling me that he used it or threatened to use it.

22          MR. FOLLY:  Certainly, your Honor.  And the government

23  is not -- the government is relying on the facts that are

24  within the PSR and does not believe it's necessary to resolve

25  those additional facts that your Honor just pointed to, but it

XLCG1QUI                          SEALED

1 does seem relevant on the broader issue of this defendant and

2 his willingness to use violence.  It does seem relevant, and it

3 hadn't been a part of our original discussion earlier before

4 the defendant spoke, so I just wanted to circle back on it,

5 your Honor.

6          THE COURT:  Okay.  And Mr. Massena, because the

7 defense speaks last, if you want to comment on what Mr. Folly

8 has just said to me, please do so.

9          MR. MASSENA:  One moment, Judge.  Can I have a moment,

10 your Honor?

11          THE COURT:  Of course.

12          MR. MASSENA:  Thank you.

13          (Mr. Massena conferring with the defendant)

14          MR. MASSENA:  Your Honor, as the Court may have seen

15 in one of Mr. Quinones's -- in one of the submissions,

16 Mr. Quinones's contention is that he -- the gun was recovered

17 in his home but that he did not walk around with the gun.

18          THE COURT:  Yes, sir.  And is that it?

19          MR. MASSENA:  That is it.

20          THE COURT:  All right.  Let me please do this.  I have

21 much to think about, given what the parties have said to me.  I

22 am going to ask for your patience.  I will probably be in my

23 robing room for about 10 minutes or so while I address these

24 issues.  I will come back as soon as I can.  I do ask for your

25 patience while I'm back there.  Thank you.

XLCG1QUI                    SEALED

1          MR. FOLLY:  Thank you, your Honor.

2          MR. MASSENA:  Thank you, your Honor.

3          THE DEPUTY CLERK:  All rise.

4          (Recess)

5          (In open court)

6          THE COURT:  Thank you very much for your patience.

7   Please be seated.

8          What I'm going to do now is outline the sentence that

9   I intend to impose, but I will give each side an opportunity to

10  make final objections, legal objections, before the sentence is

11  actually imposed.

12         And in imposing this sentence, I have considered

13  certain factors that are set forth by Congress and Section

14  3553(a) of Title 18 of the United States Code.  And a number of

15  them are addressed this afternoon.  They include the nature and

16  circumstances of the offense, the history and characteristics

17  of Mr. Quinones, the need for the sentence imposed to reflect

18  the seriousness of the offense, to promote respect for the law,

19  to provide a just punishment for the offense, to afford

20  adequate deterrence to criminal conduct, to protect the public

21  from further crimes by Mr. Quinones, to provide him with needed

22  educational and vocational training, medical care, or other

23  correctional treatment in the most effective manner.

24         I must consider the sentencing guidelines, and I'll

25  speak about them momentarily.

1    I must consider the need to avoid unwarranted sentence

2    disparities amongst similarly situated defendants.

3    I will adopt the guidelines calculations that the

4    parties have in their plea agreement.  And that begins with the

5    base offense level of 34 under guidelines Section 2D1.1, a

6    two-level enhancement for the firearm, a three-level

7    enhancement for Mr. Quinones's managerial role in the

8    conspiracy, and a three-level reduction for acceptance of

9    responsibility, yielding a final adjusted offense level of 36.

10   In doing this, I want to be clear that it doesn't mean I

11   disbelieve what Mr. West said, but from my perspective, I was

12   inclined to vary downward in any event and it was just a

13   question of from what number I would begin the downward

14   variance, so I in theory could simply have kept the enhancement

15   and varied downward that much more, but instead I have not

16   added the enhancement.

17   Mr. Quinones has three criminal history points and is

18   in criminal history category II, and the resulting guidelines

19   range is 210 to 262 months, with a mandatory minimum term of

20   120 months.  The probation office recommended a sentence of 240

21   months, but that was off of a higher guidelines range.  The

22   government is recommending a sentence within the guidelines

23   range.  And the defense is recommending a sentence at the

24   mandatory minimum.

25   And I think in just about all of my sentencings, I am

1    asked to balance very sad and tragic factors on both sides.

2    I'm balancing unfortunate upbringings or drug dependence or

3    mental health or physical issues, and I'm balancing those with

4    what is very serious criminal conduct.  This case is different

5    in some respects.  Most of the people I sentence in this

6    context are on the lower rungs of the conspiracy.  They are

7    close to Mr. Villanueva, who was himself an addict, and closer

8    to Mr. West than to someone at Mr. Quinones's level.

9    Mr. Quinones was middle management, for lack of a better term,

10   of the charged conspiracy, supervised eight to ten others,

11   supplied drugs, supplied phones, was involved in distributing

12   between 10 and 30 kilograms of heroin, and that to me is more

13   significant than many of the drug conspiracies that I've seen.

14        It is noteworthy to me that Mr. Quinones was not

15   dissuaded by the possibility of harm, and by that I mean,

16   whether or not he himself was responsible for changing the

17   stamp, he certainly could have stopped participating in the

18   organization after the overdose, and decided not to, decided to

19   continue.

20        He was not dissuaded by prior convictions, including a

21   prior federal conviction, including a federal conviction that

22   had a sentence of 84 months.  And so there are really serious

23   concerns about deterrence.

24        There is also the looming threat of violence in this

25   particular organization.  The parties agree that Mr. Quinones

1   possessed a gun.  I believe that he threatened violence.  And

2   then there is the treatment of Mr. West.  I understand that

3   that is a subject of much dispute.  And yet I will say that I

4   thought Mr. West in his sentencing -- and even if I don't

5   credit the specific events, and I'm being asked not to think

6   about the specific events that he told me -- I will say that he

7   is in part deeply psychologically harmed as a result of the

8   experience, and I will also state that he referred to his

9   relationship with Mr. Quinones as that of master and slave, and

10  so at the very least, there was a threat of violence that

11  Mr. Quinones employed.  Whether he actually beat someone, I'm

12  not sure, but the presence of the gun was there for something.

13          And then there is the issue of forfeiture.  And it

14  disturbs me that Mr. Quinones had his attorney, in the waning

15  months of his life, fight the government's motion for a

16  cautionary notice while working at the same time to circumvent

17  it.  I'm not thinking that this is obstruction of justice

18  conduct -- no one is suggesting that it is -- but it really

19  does detract from the acceptance of responsibility that he

20  otherwise showed by speaking with the government and by

21  pleading guilty.

22          I've also had to balance on the other side what is a

23  truly tragic upbringing and childhood and the losses, many

24  losses that Mr. Quinones has suffered.  More than that,

25  however, I focused on the conditions of your confinement, sir,

XLCG1QUI                          SEALED

1   over the past few years, because I too have seen what you have

2   experienced living at MDC over that period of time.  In all of

3   the sentencings -- well, I should say in most if not all of the

4   sentencings that I have done in the pandemic of detained

5   defendants, I have varied downwardly to account for the

6   conditions of confinement, and I will do that here.  But I

7   nonetheless believe that a lengthy sentence is needed for just

8   punishment, for respect for the law, and for deterrence.

9           And so I'm varying downward to a term of 190 months'

10  imprisonment, and I am ordering that that term be followed by a

11  term of supervised release of five years, with the mandatory,

12  standard, and special conditions that are outlined in the

13  presentence investigation report.

14          I am not imposing a fine or restitution.

15          I am ordering forfeiture in the amount of $232,500.

16          And I am imposing a mandatory special assessment of

17  $100.

18          Mr. Folly, is there any legal reason why I may not

19  impose this sentence?

20          MR. FOLLY:  No, your Honor.

21          THE COURT:  Mr. Folly, does any modified forfeiture

22  order have to be issued to account for the property or are the

23  government's efforts to retrieve that property sufficient to

24  keep that order as an appropriately tailored order?

25          MR. FOLLY:  Your Honor, I believe the existing order

1   at Docket No. 51 is sufficient for the government's purposes

2   for pursuing that property.

3           THE COURT:  I thank you.

4           Mr. Massena, is there any legal reason why I may not

5   impose this sentence?

6           MR. MASSENA:  No, your Honor.

7           THE COURT:  Mr. Quinones, please rise.

8           Mr. Quinones, after considering all of the factors set

9   forth in Section 3553(a) of Title 18 of the United States Code,

10  I find that a term of 190 months' imprisonment is sufficient

11  but not greater than necessary to comply with all of the

12  purposes of sentencing.

13          That term of imprisonment will be followed by a term

14  of five years of supervised release, with the mandatory,

15  standard, and special conditions we've discussed earlier.

16          I am not imposing a fine or restitution, but I am

17  ordering forfeiture in the amount of $232,500.

18          And I am imposing a mandatory special assessment of

19  $100.

20          Do you understand, sir?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Please be seated.

23          Mr. Quinones, to the extent that you have not waived

24  this in any plea agreement that you may have with the

25  government, you have the right to appeal from your conviction

XLCG1QUI                          SEALED

1   and from your sentence.  If you are interested in appeal,

2   please speak with your attorney because he is familiar with the

3   process.  Generally speaking, you have two weeks from the date

4   that the written judgment is entered in order to file your

5   notice of appeal.  My expectation is that that judgment will be

6   filed in the next day or so.

7            Do you understand, sir?

8            THE DEFENDANT:  Yes.

9            THE COURT:  Mr. Folly, are there open charges or open

10  counts or underlying charging instruments as to which the

11  government seeks dismissal?

12           MR. FOLLY:  Yes, your Honor.  The government moves to

13  dismiss at this time all open counts.

14           THE COURT:  That motion is granted.

15           And Mr. Massena, are there recommendations that you

16  would like me to make regarding a place of designation or

17  programming?

18           MR. MASSENA:  Yes, your Honor.  Mr. Quinones would

19  like to be placed within the New York metropolitan area; and

20  also, your Honor, I'd ask that the Court recommend the RDAP

21  program as well.

22           THE COURT:  I thought he did that in his prior stint

23  in the Middle District of Pennsylvania?

24           MR. MASSENA:  Just one moment, Judge.

25           (Mr. Massena conferring with the defendant)

XLCG1QUI                         SEALED

1            MR. MASSENA:  Mr. Quinones indicates that he did not

2    do the RDAP program, Judge, in his prior sentencing.

3            THE COURT:  Thank you.  I will make those

4    recommendations.  Thank you very much.

5            Mr. Folly, anything else from the government's

6    perspective?

7            MR. FOLLY:  No, your Honor.

8            THE COURT:  Mr. Massena, anything else from the

9    defense's perspective?

10           MR. MASSENA:  No, your Honor.

11           THE COURT:  I thank you.  And I wish all of you

12   safety, continued safety, and good health during this pandemic.

13   Thank you very much.  We're adjourned.

14           MR. FOLLY:  Thank you, your Honor.  You as well.

15           THE DEPUTY CLERK:  All rise.

16                              o0o

17

18

19

20

21

22

23

24

25